**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 1:26-cr-20091-LEIBOWITZ**

**UNITED STATES OF AMERICA,**

*Plaintiff,*

*v.*

**DEMETRIUS DESEAN FITTS,**

*Defendant.*
_______________________________________/

**ORDER DENYING MOTION TO SUPPRESS**

Defendant Demetrius Desean Fitts is charged with three counts arising from his alleged possession of two firearms and ammunition as a convicted felon. [ECF No. 3]. On June 10, 2026, Defendant moved to suppress certain evidence. *See* Motion to Suppress Evidence (the "Motion") [ECF No. 45]. In the Motion, the Defendant argues that some of the firearms and ammunition giving rise to those charges should be suppressed because they were obtained through a warrantless search of Defendant's apartment on the day he was arrested. [ECF No. 45 at 1–4]. The Government filed a response [ECF No. 48] and Defendant replied [ECF No. 49]. On August 17, 2026, the Court held an evidentiary hearing at which the Government called two City of Miami Police Officers involved in the investigation as witnesses [ECF No. 65]. The Government then filed a supplemental response to the Motion [ECF No. 70] to which Defendant replied [ECF No. 72].

Being fully advised, after careful consideration of the parties' arguments, the evidence, and applicable law, the Motion **[ECF No. 45]** is **DENIED**.

## I. FACTUAL FINDINGS

Consistent with the record and evidence presented at the hearing, the Court makes the following findings of fact:

In July 2025, two bodies with multiple gunshot wounds were found decomposing in the parking garage of a downtown Miami apartment building. [ECF No. 65 ("Hrg. Tr.") 95:14–17]. Investigating officers with the City of Miami Police Department ("Miami PD") soon learned that Defendant lived in that building and knew one of the victims. [*Id.* 64:19–22, 66:10–15]. Cell site location data placed Defendant with one of the victims on Miami Beach a few days before the incident, and surveillance footage, key fob logs, and fingerprints placed him in or near the parking garage around the time Miami PD suspected the incident occurred. [*Id.* 65:10–66:5, 85:2–5]. By mid-August, the Defendant was the primary suspect in the state's homicide investigation. [*Id.* 65:10–15]. By mid-to-late September, Miami PD Detective Manuel Mora began drafting a warrant to search Defendant's apartment. [*Id.* 68:2–4].

Late in the evening on October 1, 2025, Detective Mora emailed a draft search warrant application to an Assistant State Attorney ("ASA") for review and approval. [*Id.* 69:10–70:17; ECF No. 48-2]. The draft warrant application cited evidence that Miami PD had gathered with respect to the Defendant, including cell site location data, surveillance footage, key fob logs, and fingerprints, as well as evidence to confirm that the Defendant lived at the apartment listed on the warrant application. [ECF No. 66-2 at 2–5]. The application sought, among other things, "[a]ny and all firearms, ammunition, gunshot residue, magazines, casings, projectiles, holsters, gun paraphernalia, firearm purchase records, or any items associated to the operation of firearms and/or ballistics evidence." [*Id.* at 2]. The ASA returned the application to Detective Mora without edits the same evening. [Hrg. Tr. 70:2–14]. Detective Mora planned to submit the affidavit to the state court for approval the next day, after the Defendant was apprehended. [*Id.* 70:23–71:4].

The next morning, on October 2, a joint task force of the U.S. Marshals Service and Miami PD went to execute the Defendant's arrest. [*Id.* 76:5–10]. The Defendant was arrested without incident around 9:39 a.m., on the street outside his apartment while walking his dog. [*Id.* 34:8–11]. The Defendant asked the officers to leave the dog with his landlord, who lived in the building. [*Id.* 37:7–9]. He said the dog's food and medicine were in his apartment. [*Id.* 36:23–25]. After the Defendant was taken into custody, Miami PD Lieutenant Alexandar Nodar and other officers went up to the apartment and met the landlord, who was with a friend. [*Id.* 18:6–9].

Around 9:56 a.m., Lieutenant Nodar, who had been given Defendant's house key, unlocked the door to Defendant's apartment so the landlord and his friend could retrieve the dog's crate, food, and medicine. [*Id.* 38:9–15]. Lieutenant Nodar did not follow them in because he felt he did not "have the legal authority." [*Id.* 20:19–21]. As the landlord and friend walked out of the apartment, Lieutenant Nodar briefly entered the threshold of the unit to help one of the men exit, as the man was carrying the dog's unwieldy crate. [*Id.* 21:6–22:11]. (Body-worn camera footage showed that all Lieutenant Nodar saw in this brief entry was a washer and dryer in the front hall; Defendant has stipulated that this entry cannot form the basis of his motion to suppress. [*Id.* 21:9–12, 100:15–18].)

At 10:02 a.m., as soon as he learned Defendant had been arrested, Detective Mora emailed the search warrant application to the state court's on-call judge for review. [*Id.* 71:23–72:10, 76:11–14; *see* ECF No. 48-3].

Shortly after that, Lieutenant Nodar called Detective Mora with another update. [Hrg. Tr. 23:3–17, 76:15–17]. Lieutenant Nodar did not mention that he had briefly entered the apartment during the call. [*Id.* 23:15–17, 77:2–4]. Detective Mora told Lieutenant Nodar that the warrant "was in the judge's hands." [*Id.* 23:25]. Then around 10:08 a.m., Lieutenant Nodar and two other officers entered Defendant's apartment with their weapons drawn to conduct what they called a "protective sweep." [*Id.* 48:9–16]. The officers searched the unit, looking inside a closet, under the Defendant's

bed, inside an open backpack, and under a table. [*Id.* 48:17–49:21]. They saw two firearms and a pack of ammunition next to the Defendant's bed and a gun case in the closet. [*Id.* 51:5–14]. The officers exited the apartment around 10:10 a.m., and sealed it off with evidence tape and crime scene tape. [*Id.* 32:11–17, 51:21–52:2].

At 10:36 a.m., the state court judge sent a signed version of the approved search warrant back to Detective Mora. [*Id.* 72:15–22; ECF No. 48-3]. The search warrant was executed around 2:35 p.m. that afternoon. [Hrg. Tr. 57:13–16].

## II. LEGAL STANDARD

"A motion to suppress must in every critical aspect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented." *United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985) (citing *United States v. Smith*, 546 F.2d 1275 (5th Cir. 1977)).[1] "In short, the motion must allege facts which, if proven, would provide a basis for relief. A court need not act upon general or conclusory assertions founded on mere suspicion or conjecture . . . ." *Id.* (citing *United States v. Harrelson*, 705 F.2d 733 (5th Cir. 1983)).

"It is well established that the burdens of production and persuasion generally rest upon the movant in a suppression hearing." *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977) (collecting cases). But "in some well-defined situations the ultimate burden of persuasion may shift to the government upon an initial showing of certain facts by the defendant." *Id.* So, "if a defendant produces evidence that he was arrested or subjected to a search without a warrant, the burden shifts to the government to justify the warrantless arrest or search." *Id.*

The evidentiary burden at a suppression hearing is a preponderance of the evidence. *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

---

[1] All decisions handed down by the Fifth Circuit prior to September 30, 1981, are binding authority for this Court. *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981).

## III. DISCUSSION

The Fourth Amendment "expressly imposes two requirements" on law enforcement: (1) "all searches and seizures must be reasonable"; and (2) "a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity." *Kentucky v. King*, 563 U.S. 452, 459 (2011). "Because 'the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed,' it is 'a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Bates v. Harvey*, 518 F.3d 1233, 1239 (11th Cir. 2008) (quoting *Payton v. New York*, 445 U.S. 573, 585–86 (1980)).

Defendant argues that the firearms and ammunition seized from his apartment should be suppressed as the fruits of an illegal, warrantless entry into his apartment at 10:08 a.m., the day he was arrested. [ECF No. 45 at 1–2].[2] The crux of his argument is that the state court warrant issued at 10:36 a.m. was tainted by information gained during the warrantless entry the morning Defendant was arrested. [*Id.* at 3–4, 13–16]. In his view, the 10:08 a.m. entry was not a lawful protective sweep because Defendant had already been arrested 23 floors below the apartment, and the officers had no reason to believe a dangerous person was inside the apartment. [ECF No. 70 at 4–6]. The Government does not dispute that a search warrant had not been issued at the time of the 10:08 a.m. entry and sweep of the apartment. [*See id.* at 6]. But it insists that the Motion should be denied because (i) the protective sweep was lawful under the circumstances, (ii) the evidence would have inevitably been discovered, and (iii) the evidence is still admissible under the independent source doctrine. [ECF Nos. 48 at 10–19; 70 at 2–14].

---

[2] At the evidentiary hearing, Defendant's counsel agreed that the 9:56 a.m. entry cannot form the basis of this Motion since the evidence showed Lieutenant Nodar did not see any incriminating evidence. [Hrg. Tr. 103:15–17].

Even assuming *arguendo* that Miami PD's 10:08 a.m. "protective sweep" was unlawful, *see United States v. Chaves*, 169 F.3d 687, 692 (11th Cir. 1999) (finding the same where sweep occurred forty-five minutes after arrest and facts did not show a reasonably prudent officer would believe a sweep was necessary for protective purposes), the Court holds that the firearms and ammunition seized from Defendant's apartment are admissible under the inevitable discovery doctrine. In light of that holding, the Court need not address the Government's third (and related "close-cousin") argument.

"Illegally obtained evidence is admissible under the [inevitable] discovery exception if the government can make two showings." *United States v. Watkins*, 13 F.4th 1202, 1211 (11th Cir. 2021). First, it must "show by a preponderance of the evidence that it would have discovered the evidence by some other lawful means." *McKathan v. United States*, 969 F.3d 1213, 1232 (11th Cir. 2020) (citations omitted). And second, it must "demonstrate that before the unlawful activity occurred, it was actively pursuing the lawful means that would have rendered discovery inevitable." *Id.* (citation omitted); *see United States v. Campton*, 2024 WL 4225488, at *3 (S.D. Fla. Sept. 18, 2024) (Altonaga, C.J.).

With the benefit of the evidentiary hearing—and particularly the testimony of Detective Mora—it is clear that the inevitable discovery doctrine applies here.

First, the firearms and ammunition the officers saw during the 10:08 a.m. search would have been discovered "by some other lawful means," *McKathan*, 969 F.3d at 1232—more precisely, the search warrant issued and executed later that day that listed among the items to be seized, "[a]ny and all firearms, ammunition, gunshot residue, magazines, casings, projectiles, holsters, gun paraphernalia, firearm purchase records, or any items associated to the operation of firearms and/or ballistics evidence." [ECF No. 48-1 at 2]. Defendant does not meaningfully dispute this point in his papers. [ECF No. 72 at 8].

Second, the record makes clear that Miami PD had been "actively pursuing the lawful means that would have rendered discovery" of the firearms and ammunition "inevitable." *McKathan*, 969

F.3d at 1232. Miami PD identified Defendant as the primary suspect in their double homicide investigation in mid-August. [Hrg. Tr. 65:10–15]. During that investigation, they pulled cell site location data, surveillance footage, key fob logs, and fingerprints that linked Defendant to the victims around the time of their deaths. [*Id.* 65:10–66:5, 85:2–5]. Detective Mora began drafting the search warrant application for the Defendant's apartment in mid-to-late September. [*Id.* 68:2–4]. The night before the authorized search occurred, he sent a final version of that application to an ASA for approval, *which was identical to the application the state court ultimately signed*. [*Id.* 70:12–14]. And he submitted that application at 10:02 a.m. the next morning—six minutes before the 10:08 a.m. (likely unauthorized) sweep of the apartment. [*Id.* 71:23–72:10].

Under Eleventh Circuit precedent, all that conduct falls well within the bounds of the second prong of the inevitable discovery doctrine. In *United States v. Terzado-Madruga*, for instance, the Eleventh Circuit held the inevitable discovery doctrine applied to an illegally recorded phone conversation because one of the defendant's co-conspirators was cooperating with law enforcement, and in the court's view, would have been able to provide the same information to law enforcement later. 897 F.2d 1099, 1115 (11th Cir. 1990). The court concluded that "the leads making the discovery inevitable were possessed by and being actively pursued by the police prior to the illegal interrogation." *Id.* Here we are far beyond "leads"; we have a two-month investigation and submitted search warrant application, pending at the time of the warrantless search, that targeted the exact evidence the officers saw during the sweep of the apartment. That is more than enough to satisfy the inevitable discovery doctrine. *See United States v. Hugger*, 2022 WL 2702626, at *2-3 (S.D. Fla. July 12, 2022) (Martinez, J.) (citing *Watkins*, 13 F.4th at 1211) (applying inevitable discovery doctrine to cell phone data obtained through non-*Mirandized* interrogation, where search warrant for cell phone was pending when non-*Mirandized* custodial interrogation began).

In his post-hearing submission, Defendant warns that the Government asks the Court to sanction "premature execution" of search warrants. [ECF No. 72 at 8]. "If accepted," he argues, "officers with a pending warrant application could enter a home before judicial approval whenever they believe approval is likely." [*Id.*]. To be clear, nothing in the Court's decision today sanctions warrantless searches while a warrant application is pending. The Court's holding is limited to the facts of this case, which establish that at the time of the protective sweep, Miami PD had been investigating Defendant in connection with a double homicide for two months and already had a warrant application pending at the time of the search that was approved in identical form just half an hour later.

## IV. CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED** that the Motion **[ECF No. 45]** is **DENIED**.

**DONE AND ORDERED** in the Southern District of Florida on September 25, 2026.

DAVID S. LEIBOWITZ
UNITED STATES DISTRICT JUDGE

cc: counsel of record